**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **JASMINE JOHNSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.** |
| ) | |
| ) | **JURY TRIAL DEMANDED** |
| ) | |
| **ALABAMA DEPARTMENT OF** ) | |
| **CORRECTIONS; WARDEN DEIDRA** ) | |
| **WRIGHT; WARDEN LAGRETA** ) | |
| **MCCLAIN; WARDEN KENNETH** ) | |
| **DRAKE; LAQUENTIN BRANTLEY;** ) | |
| **KAMARIA WHITESIDE;** ) | |
| **JOHN DOE CORRECTIONAL OFFICERS** ) | |
| **1-10; and JOHN DOE SUPERVISORS 1-10** ) | |
| ) | |
| **Defendants.** ) | |

**<u>COMPLAINT</u>**

1.    This is an action for deprivation of civil rights under the Civil Rights Act, pursuant to 42 U.S.C. § 1983, and under Alabama law. Plaintiff brings this civil rights action to redress the deprivation under color of state law of the rights, privileges, and immunities secured to Plaintiff by the laws and Constitution of the United States and the State of Alabama.

2.   This action arises from the rape and sexual assault of Jasmine Johnson, a woman incarcerated at Julia Tutwiler Prison for Women ("Tutwiler"), who was placed into solitary confinement and then sexually assaulted by Correctional Officer LaQuentin Brantley, the only officer supervising her segregation cell. While Plaintiff was isolated, powerless, and entirely dependent on staff for safety and release from segregation, Brantley used his authority to tell her

that if she ever wanted to go home, she had to do what he said, **and then forced sexual acts including digital penetration and forced oral sex**.

3.  The assault was not an unavoidable tragedy. It was the foreseeable result of **systemic indifference**, **gross supervisory failures**, and deliberate choices that ignored the Eighth Amendment's most basic requirement: **to protect incarcerated people from known and substantial risks of serious harm**, including the well-documented and long-standing risk of staff-on-prisoner sexual abuse at Tutwiler—particularly against women in segregation.

4.  Tutwiler has long been notorious for sexual abuse and exploitation of women by correctional staff. It has been repeatedly documented and widely reported that Tutwiler has suffered **one of the highest rates of sexual victimization among women's correctional facilities**. Defendants were on notice—through years of investigations, litigation, and institutional history—that sexual abuse by staff at Tutwiler was not speculative. It was predictable.

5.  In September–October 2024, nearly a decade of federal oversight mechanisms addressing sexual abuse conditions at Tutwiler was largely terminated. In the **same month**, Plaintiff was placed alone in segregation and raped by an officer who had repeated access to women and whose explicit sexual comments were known and normalized in the prison environment. The timing is not incidental. It underscores how quickly constitutional safeguards collapse when leadership tolerates a culture of impunity.

6.  After Plaintiff reported the rape, other incarcerated women came forward with similar allegations against Brantley. A federal investigation found the claims credible. Brantley was terminated and arrested on charges including rape and sodomy. These post-assault actions confirm what Defendants should have prevented: the State placed Plaintiff in the custody of a system that

allowed a predatory guard unsupervised access to a woman in solitary and then failed to protect her.

## JURISDICTION

7.    This Court has jurisdiction over the claims in this lawsuit pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367. This Court also has supplemental jurisdiction over Plaintiff's state law claims.

8.    Tutwiler, where Plaintiff was detained and where a substantial part—if not all—of the unlawful acts alleged herein occurred, is located in Elmore County, Alabama. Thus, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

9.    At all times material to Plaintiff's claims, Defendants were state actors acting under color of state law.

10.    Plaintiff has exhausted the requisite administrative remedies pursuant to 42 U.S.C. Section 1997e (known as the "Prison Litigation Reform Act" or "PLRA").

## STATEMENT OF THE PARTIES

11.    Plaintiff Jasmine Johnson is an individual over the age of nineteen (19) years and a citizen of the United States. At all times material to this complaint, Plaintiff was incarcerated at Tutwiler, a women's prison operated by the Alabama Department of Corrections.

12.    Defendant Alabama Department of Corrections ("ADOC") is a state agency that operates prisons throughout the State of Alabama, including Tutwiler, and is responsible for the operations, policies, staffing, and enforcement of safety standards at Tutwiler. ADOC has long been on notice of staff-on-inmate sexual abuse risks at Tutwiler and has been responsible for implementing safeguards, staffing plans, training requirements, supervision practices, and reporting mechanisms to prevent sexual abuse, including safeguards for women housed in

segregation. ADOC acted pursuant to customs and policies that tolerated predictable failures to protect women from sexual exploitation and assault by staff.

13.    Defendant Warden Deidra Wright is an individual over the age of nineteen (19) years and a citizen of the United States. At all times material to this complaint, Wright served in a warden-level leadership role at Tutwiler with responsibility for prison operations, supervision of correctional staff, staffing assignments, segregation procedures, enforcement of PREA-related protections, and implementation of policies designed to protect incarcerated women from sexual abuse. Wright had actual or constructive knowledge of chronic failures at Tutwiler involving sexual misconduct by staff and the heightened vulnerability of women in segregation, yet failed to implement effective safeguards, failed to ensure adequate monitoring and staffing, and failed to correct staff behavior. At all times relevant, Wright was a state actor acting under color of state law for purposes of 42 U.S.C. § 1983.

14.    Defendant Warden Lagreta McClain is an individual over the age of nineteen (19) years and a citizen of the United States. At all relevant times, McClain served in warden-level leadership at Tutwiler and was responsible for daily operational oversight, including supervision of custody staff, review of segregation procedures, enforcement of mandatory monitoring and documentation protocols, and ensuring staff compliance with policies designed to prevent sexual abuse and retaliation. McClain had actual or constructive knowledge of chronic failures in segregation supervision and officer misconduct, including the risks presented by assigning single officers to supervise isolated women, yet failed to intervene, correct noncompliance, enforce meaningful oversight, or implement corrective training. McClain was a state actor under § 1983.

15.    Defendant Warden Kenneth Drake is an individual over the age of nineteen (19) years and a citizen of the United States. At all relevant times, Drake served in warden-level

4

leadership at Tutwiler and was responsible for custody operations, security policy enforcement, staffing and supervision systems, and compliance with constitutional obligations and anti-sexual-abuse safeguards. Drake had actual or constructive knowledge of longstanding patterns of sexual abuse risk at Tutwiler and the predictable vulnerability of women placed in segregation, yet failed to ensure appropriate staffing, monitoring, supervision, and reporting. Drake was a state actor under § 1983.

16.     Defendant LaQuentin Brantley is an individual over the age of nineteen (19) years and a citizen of the United States. At all relevant times, Brantley was employed by ADOC as a correctional officer at Tutwiler and acted under color of state law. Brantley used his authority as an officer to sexually harass and sexually assault incarcerated women, including Plaintiff. Brantley was a state actor under § 1983 and is sued in his individual capacity.

17.     Defendant Kamaria Whiteside is an individual over the age of nineteen (19) years and a citizen of the United States. At all relevant times, Whiteside was employed by ADOC as a correctional officer assigned to the segregation unit at Tutwiler. Whiteside was present and on duty during Plaintiff's segregation placement in October 2024. In fact, Whiteside was tasked with both guarding and protecting Plaintiff while she was in segregation. However, Whiteside failed to intervene when Brantley continually sexually assaulted Plaintiff, despite having personal knowledge it was occurring. Whiteside knowingly allowed Brantley to remain alone with Plaintiff in violation of policy and safety standards. Whiteside is a state actor under 42 U.S.C. § 1983 and is sued in her individual capacity.

18.     Unknown Defendant John Doe Correctional Officers 1–10 are individuals whose names and identities are presently unknown to Plaintiff and who were, at all relevant times, correctional officers employed at Tutwiler. These Defendants were responsible for monitoring

inmates, conducting rounds, documenting observations, reporting misconduct, responding to inmate complaints, and ensuring compliance with policies designed to protect the health and safety of incarcerated women. These officers either knew or should have known of Brantley's sexually explicit conduct toward women, the unsafe conditions in segregation, and/or the failures in monitoring that enabled Brantley's assault. At all times relevant to this Complaint, John Doe Correctional Officers 1–10 acted pursuant to customs and practices of deliberate indifference to prisoner safety and were state actors under § 1983.

19.     Unknown Defendant John Doe Supervisors 1–10 are individuals whose names and identities are presently unknown to Plaintiff and who were, at all relevant times, captains, lieutenants, sergeants, shift commanders, and/or supervisory officials employed at Tutwiler. These Defendants were responsible for supervising officers, approving staffing decisions, ensuring compliance with segregation monitoring requirements, responding to reports of misconduct, and enforcing safeguards designed to prevent sexual abuse. These supervisors had actual or constructive knowledge of chronic failures in segregation monitoring and the heightened risk of staff sexual abuse at Tutwiler, yet failed to take corrective action, failed to discipline staff, failed to implement adequate safeguards, and failed to intervene. John Doe Supervisors 1–10 are state actors under § 1983.

## STATEMENT OF THE FACTS

**A.     Julia Tutwiler Prison for Women: A Facility Defined by Sexual Abuse Risk, Understaffing, and Institutional Indifference**

20.     Tutwiler has long been recognized as one of the most troubled women's correctional facilities in the United States with respect to sexual safety. The facility has been repeatedly associated with staff sexual abuse, staff sexual harassment, inadequate supervision, and retaliation concerns, particularly in restrictive housing environments. Importantly, Tutwiler's

sexual abuse crisis is not limited to isolated incidents or "bad apples." Following an investigation, the United States Department of Justice concluded that conditions at Tutwiler reflected systemic failures—including widespread staff sexual abuse and harassment, inadequate supervision, and a pervasive fear of retaliation—that created an ongoing and substantial risk of sexual victimization for incarcerated women. These findings constitute notice to ADOC and Tutwiler leadership of a long-standing pattern and practice of staff-on-prisoner sexual misconduct and institutional tolerance of that misconduct. (*See* Exh. A—U.S. Department of Justice Findings).

21.    For nearly a decade prior to October 2024, the United States Department of Justice investigated conditions at Julia Tutwiler Prison for Women and found a pattern and practice of staff-on-prisoner sexual abuse, sexual harassment, and systemic failures in staffing, supervision, reporting, and protection from retaliation—conditions that placed women at a continuing and substantial risk of sexual assault, including in restrictive housing. (*See* Exh. A—U.S. Department of Justice Findings). As a result of those findings, ADOC and Tutwiler were subjected to federal court oversight and remedial measures designed to prevent sexual abuse, improve staffing and supervision, and ensure compliance with the Prison Rape Elimination Act ("PREA"). (*See* Exh. B—Consent Decree). In the words of the United States Department of Justice:

> The women at Tutwiler universally fear for their safety. They live in a sexualized environment with repeated and open sexual behavior, including: abusive sexual contact between staff and prisoners; sexualized activity, including a strip show condoned by staff; profane and unprofessional sexualized language and harassment; and deliberate cross-gender viewing of prisoners showering, urinating, and defecating. The inappropriate sexual behavior, including sexual abuse, continues, and is grossly underreported, due to insufficient staffing and supervision, inadequate policies and procedures, a heightened fear of retaliation, and an inadequate investigative process.

(Exh. A—U.S. Department of Justice Findings). These DOJ findings describe a systemic environment—staff sexual abuse occurring openly, gross underreporting driven by fear of retaliation, and deficient staffing and supervision—that is indicative of an institutional pattern and

practice rather than episodic misconduct. They further establish that ADOC and Tutwiler leadership were on actual notice that, absent rigorous supervision and enforcement of safeguards, correctional staff at Tutwiler had repeatedly exploited their authority to sexually abuse incarcerated women.

22.     The federal oversight and remedial measures were imposed because sexual abuse by correctional staff at Tutwiler was not sporadic or speculative, but systemic, recurring, and foreseeable—especially in segregation units where women are isolated, dependent on officers for movement, safety, and basic necessities, and therefore uniquely vulnerable to coercion and exploitation by staff.

23.     On information and belief, in or around September–October 2024—just weeks before Plaintiff was placed in segregation and raped—key federal oversight mechanisms and court-enforced safeguards governing sexual-abuse prevention at Tutwiler were reduced, expired, or terminated, leaving ADOC leadership solely responsible for enforcing protections that had previously been imposed because of Tutwiler's long-standing history of staff sexual abuse.

24.     Publicly available DOJ findings, PREA audits, and federal court filings have repeatedly documented that Tutwiler experienced one of the highest rates of sexual victimization and staff sexual misconduct among women's prisons in the United States, along with chronic failures in staffing, supervision, reporting, and retaliation protection. These findings placed ADOC, Wardens Wright, McClain, and Drake, and supervisory staff on actual notice that sexual abuse by staff—particularly in segregation—was a predictable, ongoing, and constitutionally intolerable risk.

25.     Despite years of federal warnings and remedial mandates, Tutwiler's leadership permitted a culture of impunity to persist, in which male officers retained unsupervised access to

isolated women, sexualized comments and boundary violations were tolerated, and reporting mechanisms were ineffective or retaliatory—creating precisely the conditions under which Brantley was able to exploit his authority to rape Plaintiff.

26. A pervasive culture took root at Tutwiler in which sexual harassment by staff, sexualized comments, and boundary violations were normalized, minimized, or ignored. This culture was not hidden. It existed in plain view of housing units, segregation operations, and supervisory chains of command.

27. Chronic understaffing and lax oversight resulted in predictable failures to conduct meaningful monitoring, failures to document misconduct, and failures to promptly respond to reports of abuse. Instead of treating staff sexual abuse as a constitutional emergency, prison leadership tolerated conditions that allowed predatory conduct to occur without detection or accountability.

28. Supervisors and wardens at Tutwiler were aware—through institutional history, prior incidents, investigations, and the nature of a women's prison environment—that women housed in segregation are uniquely vulnerable to sexual coercion and assault. Women in segregation are locked alone, dependent on staff for basic necessities, movement, and relief from isolation, and are therefore especially susceptible to abuse by staff who control access and privileges.

29. Despite this knowledge, Tutwiler's leadership failed to implement effective safeguards to prevent male officers from gaining unsupervised access to women in segregation and failed to ensure meaningful supervision and accountability for officers assigned to segregation operations.

Case 2:26-cv-00016-BL-CWB    Document 1    Filed 01/09/26    Page 10 of 25

**B.     Jasmine Johnson: A Woman in State Custody Placed into a Known Zone of Vulnerability**

30.     Plaintiff Jasmine Johnson is a single mother of young children and was incarcerated at Tutwiler beginning in or near April 2019.

31.     Plaintiff was not in a position to protect herself from staff abuse. She was in State custody. She could not leave. She could not choose her housing unit. She could not control which officers were assigned to her tier. She was dependent on Defendants for basic safety.

32.     Throughout her incarceration, Plaintiff was exposed to an environment in which correctional officers exercised total control over movement, discipline, privileges, and housing decisions, including placement in segregation.

**C.     Brantley's Sexualized Conduct and the Known Risk He Presented**

33.     During Plaintiff's incarceration, Defendant Brantley made repeated explicit sexual comments to Plaintiff and to other incarcerated women.

34.     Brantley's conduct was consistent with a pattern often seen in custodial sexual abuse: grooming, sexualized intimidation, and exploitation of institutional power over isolated women.

35.     On information and belief, Brantley's conduct was known, or should have been known, to staff and supervisors through repeated exposure, prior complaints, and/or visible behavioral indicators that required intervention.

**D.     Segregation: Isolation, Control, and the Conditions that Enable Sexual Assault**

36.     Segregation at Tutwiler is restrictive housing where women are isolated, locked in cells, and deprived of normal protective visibility and social contact.

37.     Segregated women are dependent on officers for the most basic functions—food, hygiene items, movement, medical requests, and communication. Officers control whether a woman is heard, whether a complaint is forwarded, and whether she receives relief.

38.     A single officer supervising an isolated woman in segregation has extraordinary power over her physical safety and the conditions of her confinement. This is precisely why meaningful monitoring and supervision are essential, and why the assignment of a lone officer to a vulnerable woman in segregation is a known, obvious risk factor for sexual abuse.

**E.      The October 2024 Segregation Placement and Assault**

39.     In or near October 2024, Plaintiff was involved in an altercation with another inmate and was placed into solitary confinement for the weekend.

40.     During this segregation period, Defendant Brantley was the only officer on duty supervising Plaintiff's cell.

41.     Defendant Kamaria Whiteside was also on duty in the segregation unit during Plaintiff's placement. Brantley ordered Whiteside to leave the post—which was against protocol—so that he would be alone with Plaintiff. Whiteside complied and left Plaintiff isolated with Brantley, despite knowing that a male officer being alone with a woman in segregation presented a serious and obvious risk of sexual abuse.

42.     While Plaintiff was isolated and unable to protect herself, Brantley told Plaintiff that if she ever wanted to go home and be reunited with her children, she had to do what he said. He used the promise of release and the power of confinement to coerce compliance.

43.     Brantley then sexually assaulted Plaintiff multiple times over that weekend. Specifically, each night, Brantley would forcefully ***digitally penetrate her vagina and anus***, and on the last night, forced Plaintiff to ***perform oral sex on him***. Each and every one of these abhorrent

actions was expressly unwanted by Plaintiff—however, Brantley boasted to her that he held the key to her ever seeing her children again so she had to do whatever he said.

44.    As such, Plaintiff's actions were inherently coerced by the power imbalance, the threat of retaliation, and the coercive environment of isolation.

45.    During the sodomy episode, after Brantley ejaculated, he left. Plaintiff then spit his semen onto the wall, wiped it with a rag, and preserved the rag by placing it into a cup—an act reflecting both the immediacy of the violation and Plaintiff's fear that she would not be believed without physical evidence.

46.    Plaintiff remained in this coercive environment of segregation until she was released from solitary.

47.    After Plaintiff was released from segregation, she immediately reported the sexual assault to Defendant Whiteside. Whiteside contacted a supervising sergeant and advised that Plaintiff had been placed in segregation on Brantley's instruction. The sergeant responded that Plaintiff was not supposed to be housed in segregation and questioned why she had been placed there at all. Whiteside confirmed that Brantley had directed the placement. Despite this explicit notice that Plaintiff had been unlawfully placed in segregation and sexually assaulted, neither Whiteside nor Tutwiler took any immediate protective or investigative action.

48.    After Plaintiff was released from segregation and reported the rape to Defendant Whiteside, Whiteside disclosed Plaintiff's report of sexual assault to other staff and inmates inside the housing unit, including inmate Shakela Minnifield.

49.    As a direct result of Whiteside's disclosure, Minnifield confronted Plaintiff and stated: ***"You can't rape the willing."*** This statement accused Plaintiff of lying about her rape,

labeled her a sexual participant rather than a victim, and exposed her to humiliation, intimidation, and danger within the prison environment.

50.    Defendant Whiteside knew or should have known that disclosing Plaintiff's sexual-assault report to other inmates would subject Plaintiff to retaliation, intimidation, and harassment and would deter her from pursuing further complaints.

**F.    Immediate Reporting, Corroboration, and the Credible Findings**

51.    After Plaintiff reported, other incarcerated women came forward with similar allegations involving Brantley's sexually explicit conduct and sexual misconduct.

52.    Because Tutwiler staff failed to act, Plaintiff reported the rape to prison advocate Perrion Roberts, a regular visitor to the facility. Roberts contacted the Equal Justice Initiative (EJI), which assisted Plaintiff in filing a formal PREA complaint after institutional reporting channels failed.

53.    A federal investigation, including a review of the relevant surveillance cameras, determined that Plaintiff's allegations against Defendant LaQuentin Brantley were credible. As a result of that investigation and direct evidence of misconduct, Defendant Alabama Department of Corrections had no choice but to terminate Brantley from his position as a correctional officer.

54.    Brantley was arrested and later indicted in the Circuit Court of Elmore County, Alabama, in *State of Alabama v. LaQuentin Brantley*, Case No. CC-2025-000352.00, on felony charges including rape and sodomy arising from his sexual assault of Plaintiff. (*See* Exh. C—Indictment of Brantley).

55.    The indictment and criminal prosecution further confirm the credibility of Plaintiff's report and demonstrate that the conduct at issue was not a misunderstanding, but a violent sexual assault committed under color of state law.

56.     Plaintiff turned over the semen-soaked rag she preserved to Detective Ramsey of the FBI, and Detective Pilgrim obtained the surveillance footage, establishing a formal chain of custody and preserving evidence of Brantley's sexual assault.

57.     These post-assault actions confirm the severity of the misconduct and underscore the preventability of the assault had Defendants implemented constitutional safeguards before the violation occurred.

**G.     ADOC's Actual PREA Notice and Failure to Separate the Victim from Her Rapist**

58.     On October 24, 2024, Plaintiff formally made a PREA complaint against Defendant LaQuentin Brantley for sexual assault.

59.     In November 2024, the Alabama Department of Corrections issued written notice to Plaintiff confirming that Sergeant L. Brantley had been reassigned pending a PREA investigation based on Plaintiff's allegation.

60.     That notice confirmed that ADOC had formally referred the sexual-assault allegations to the Law Enforcement Services Division (LESD) for criminal investigation.

61.     Despite this confirmation of a credible rape allegation, ADOC did not immediately and permanently separate Plaintiff from Defendant Brantley, nor did it remove all staff who facilitated or enabled his access to Plaintiff.

62.     ADOC did not transfer Plaintiff to a safe facility, did not remove Defendant Whiteside from authority over Plaintiff, and did not ensure that Plaintiff was protected from exposure to Brantley's colleagues or retaliation.

63.     Instead, Plaintiff remained confined in the same institution, under the control of officers who had knowledge of the rape and who had participated in the unlawful segregation that allowed the assault to occur.

64.     This failure to separate Plaintiff from those connected to her sexual assault violated PREA standards, ADOC policy, and the Eighth Amendment's prohibition on deliberate indifference to a substantial risk of harm.

**H.      Retaliation, Exposure, and Continued Threats After the Rape Was Reported**

65.     After Plaintiff reported her rape, Defendant Whiteside disclosed Plaintiff's sexual assault report to other inmates and staff inside the housing unit. This was an attempt to label Plaintiff as a "snitch," which risked putting Plaintiff in severe danger.

66.     As a direct result of Whiteside's disclosure, inmate Shakela Minnifield confronted Plaintiff and accused her of lying about the rape, stating, "You can't rape the willing."

67.     This disclosure exposed Plaintiff to humiliation, danger, retaliation, and intimidation inside a prison environment where inmates who report sexual abuse are routinely targeted.

68.     Following her report, Plaintiff was subjected to continued verbal harassment, retaliation, and fear for her safety by both inmates and correctional staff.

69.     Plaintiff filed multiple written grievances in November and December 2024 reporting retaliation, continued danger, and the failure of prison officials to protect her from exposure to Defendant Brantley and Defendant Whiteside.

70.     Plaintiff repeatedly warned prison officials that she remained at risk because the officers who enabled the rape still controlled her housing, visitation, and movement.

71.     ADOC took no meaningful corrective action. Defendant Whiteside remained employed, remained assigned to segregation, and continued exercising authority over Plaintiff.

72.     Rather than protect Plaintiff, Defendants allowed her to remain in a coercive, retaliatory environment that punished her for reporting a sexual assault.

73.     These actions were intended to deter Plaintiff from pursuing her complaint and to signal to other incarcerated women that reporting sexual abuse would result in retaliation and danger.

**I.      Systemic Breakdown: Failures at Every Level**

74.     The failures that led to Plaintiff's assault were systemic, not isolated. Line officers failed to report sexualized conduct. Supervisors failed to enforce monitoring and staffing safeguards in segregation. Wardens failed to implement corrective measures and meaningful oversight despite well-known risks at Tutwiler.

75.     Defendants' practices effectively created a zone of impunity in segregation—where women were isolated, monitoring was lax, and predatory officers could exploit access and power.

76.     The constitutional duty to protect incarcerated women is not satisfied by paper policies. It requires actual enforcement, adequate staffing, real supervision, and immediate response to sexualized misconduct. Defendants failed each of those obligations.

**COUNT ONE**
**FAILURE TO PROTECT**
**Under 42 U.S.C. § 1983**
(Against all Defendants)

77.     The Plaintiff re-alleges and incorporates by reference paragraphs 20-76 above, with the same force and effect as if fully set out in specific detail herein.

78.     Defendants, acting under color of law, deprived Plaintiff of her constitutional rights secured through 42 U.S.C. § 1983, by the Eighth and Fourteenth Amendments of the United States Constitution, resulting in egregious violations of her bodily integrity.

79.     At all relevant times, these Defendants owed Plaintiff a constitutional duty to protect her from known and substantial risks of serious harm, including the known risk of staff-on-inmate sexual abuse in segregation.

80.     Defendants had actual or constructive knowledge of the substantial risk of sexual assault at Tutwiler through Tutwiler's long-standing history of sexual abuse risk, the heightened vulnerability of women in segregation, and the foreseeable danger created by unsupervised officer access to isolated women.

81.     Defendants consciously disregarded these known risks by, among other things:

(a) allowing a male officer to supervise Plaintiff alone in segregation;

(b) failing to implement meaningful monitoring and accountability for segregation officers;

(c) failing to respond appropriately to sexualized misconduct and sexually explicit comments by Brantley;

(d) failing to train staff to recognize and prevent custodial sexual abuse;

(e) failing to enforce safeguards designed to prevent sexual abuse in restrictive housing.

82.     Defendants' decisions not to act were not mere negligence. Their failure to implement and enforce basic protective measures in segregation demonstrates deliberate indifference to a substantial risk of serious harm.

83.    Defendants are not entitled to qualified immunity because, at the time of these events, it was clearly established that prison officials violate the Eighth Amendment when they knowingly disregard a substantial risk of serious harm to an inmate, including by ignoring repeated reports of threats and assaults and failing to take reasonable measures to abate the risk.

84.    Defendants were personally involved in violating Plaintiff's constitutional rights through either direct participation or by their failure to protect her from a known danger in violation of the Eighth Amendment.

85.    Defendants' deliberate indifference directly and proximately resulted in Plaintiff's injuries and damages.

**COUNT TWO**
**SEXUAL ASSAULT/CRUEL AND UNUSUAL PUNISHMENT**
**Under 42 U.S.C. § 1983**
(Against All Defendants)

86.    The Plaintiff re-alleges and incorporates by reference paragraphs 20-76 above, with the same force and effect as if fully set out in specific detail herein.

87.    At all relevant times, Defendants were acting under color of state law.

88.    Sexual assault by a correctional officer against a person in custody constitutes cruel and unusual punishment in violation of the Eighth Amendment, as incorporated through the Fourteenth Amendment.

89.    Brantley used his authority, Plaintiff's segregation status, and the coercive environment of confinement to force sexual acts on Plaintiff, including digital penetration and forced oral sex. Defendants either knew of this or should have known.

90.    Defendants' conduct violated clearly established constitutional law, and no reasonable officer could believe it lawful to sexually assault an incarcerated woman.

91.     As a direct and proximate result of Defendants' reprehensible conduct, Plaintiff suffered severe emotional distress, humiliation, psychological trauma, and other damages.

## COUNT THREE
## FAILURE TO INTERVENE
### Under 42 U.S.C. § 1983
(Against Kamaria Whiteside, John Doe Correctional Officers 1–10, and John Doe Supervisors 1–10)

92.     The Plaintiff re-alleges and incorporates by reference paragraphs 20-76, above with the same force and effect as if fully set out in specific detail herein.

93.     These Defendants had the authority, means, and duty to prevent or stop constitutional violations, including custodial sexual abuse, by ensuring segregation posts were properly supervised, monitored, and subject to accountability.

94.     These Defendants had opportunities to intervene by enforcing staffing safeguards, supervising segregation operations, responding to complaints and warning signs regarding Brantley's sexually explicit conduct, and ensuring reporting and documentation. Defendants either personally observed or should have observed Brantley's reprehensible sexual assaults.

95.     Defendant Whiteside had actual knowledge that Brantley was isolating Plaintiff in segregation, that Plaintiff was not authorized to be housed there, and that Brantley had ordered Whiteside to leave so that he could be alone with Plaintiff. Whiteside nevertheless complied and affirmatively enabled Brantley's access to Plaintiff and later failed to take any action after learning that Plaintiff had been raped.

96.     Instead, Defendants chose inaction in the face of obvious risk factors and foreseeable harm.

97.     As a direct and proximate result of Defendants' failure to intervene, Plaintiff was raped and suffered the damages described herein.

## COUNT FOUR
## FAILURE TO TRAIN AND SUPERVISE
### Under 42 U.S.C. § 1983
(Against Alabama Department of Corrections; Warden Wright; Warden McClain; Warden Drake;
and John Doe Supervisors 1–10)

98.     The Plaintiff re-alleges and incorporates by reference paragraphs 20-76 above, with the same force and effect as if fully set out in specific detail herein.

99.     Defendants, acting under color of law, directly or indirectly deprived Plaintiff of her constitutional rights secured through 42 U.S.C. § 1983 and the Eighth Amendment, as incorporated through the Fourteenth Amendment, resulting in her injuries and damages outlined herein.

100.    These Defendants had a duty to adequately train and supervise correctional staff regarding the prevention of staff-on-inmate sexual abuse, segregation safeguards, monitoring requirements, reporting obligations, and constitutional duties, and the duty to intervene when faced with constitutional violations.

101.    These Defendants were aware of chronic risks and failures related to sexual abuse at Tutwiler, including the predictable vulnerability of women in segregation and the foreseeable danger of unsupervised officer access.

102.    Despite this knowledge, Defendants failed to implement corrective training, failed to enforce meaningful supervision, failed to ensure adequate staffing and monitoring in segregation, and failed to discipline staff for boundary violations and misconduct.

103.    This failure to train and supervise amounted to deliberate indifference and was a moving force behind the constitutional violations suffered by Plaintiff. Had Defendants trained and supervised their staff and followed Eighth Amendment standards, Plaintiff would not have been left alone with a sexual predator and raped multiple times.

104.    As a direct and proximate result of Defendants' failures, Plaintiff was raped and suffered severe damages.

## COUNT FIVE
### ASSAULT
### Under Alabama Law
(Against LaQuentin Brantley)

105.    The Plaintiff re-alleges and incorporates by reference paragraphs 20-76 above, with the same force and effect as if fully set out in specific detail herein.

106.    At all times material hereto, Defendant Brantley intentionally placed Plaintiff in reasonable apprehension of an imminent harmful and offensive touching by using his authority as a correctional officer, Plaintiff's segregation status, and the coercive environment of solitary confinement to compel sexual conduct.

107.    Brantley communicated, expressly and by conduct, that Plaintiff's ability to "go home," be reunited with her young children, and obtain relief from confinement depended on doing what he demanded, thereby threatening adverse consequences if she refused and creating immediate fear of harm and retaliation.

108.    Plaintiff reasonably apprehended that Brantley would carry out harmful and offensive contact if she did not comply.

109.    Defendant Brantley's conduct constitutes assault under Alabama law.

110.    As a direct and proximate result of Brantley's assault, Plaintiff suffered damages including humiliation, fear, emotional distress, and other compensable injuries.

## COUNT SIX
## BATTERY
### Under Alabama Law
(Against LaQuentin Brantley)

111.    The Plaintiff re-alleges and incorporates by reference paragraphs 20-76 above, with the same force and effect as if fully set out in specific detail herein.

112.    Defendant Brantley intentionally and unlawfully touched Plaintiff in a harmful and offensive manner without consent.

113.    Specifically, while Plaintiff was incarcerated and isolated in segregation, Brantley forced sexual acts including digital penetration and compelled oral sex.

114.    Plaintiff did not consent to this contact. Any purported "consent" was invalid as a matter of law and fact because it was obtained through coercion and abuse of custodial authority.

115.    Defendant Brantley's conduct constitutes battery under Alabama law.

116.    As a direct and proximate result of Brantley's battery, Plaintiff suffered damages including severe emotional distress, mental anguish, humiliation, and other compensable injuries.

## COUNT SEVEN
## OUTRAGE/INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Under Alabama Law
(Against LaQuentin Brantley)

117.    The Plaintiff re-alleges and incorporates by reference paragraphs 20-76 above, with the same force and effect as if fully set out in specific detail herein.

118.    Defendant Brantley's conduct was intentional or reckless, extreme and outrageous, and beyond all possible bounds of decency in a civilized society.

119.    Brantley exploited Plaintiff's incarceration, isolation, and vulnerability in solitary confinement; used his authority as a correctional officer to coerce sexual compliance; and forcibly subjected Plaintiff to sexual assault.

120.    Brantley knew or should have known that his conduct would cause Plaintiff severe emotional distress, and he acted with willful disregard for Plaintiff's bodily integrity and psychological wellbeing.

121.    Plaintiff in fact suffered severe emotional distress, mental anguish, humiliation, anxiety, and trauma as a result of Brantley's conduct.

122.    Defendant Brantley's conduct constitutes the tort of outrage under Alabama law.

123.    As a direct and proximate result of Brantley's outrageous conduct, Plaintiff is entitled to recover compensatory damages, and punitive damages as allowed by law.

## COUNT EIGHT
## FIRST AMENDMENT RETALIATION
### Under 42 U.S.C. § 1983
(Against Kamaria Whiteside, Deidra Wright, Lagreta McClain, Kenneth Drake, John Doe Correctional Officers 1-10, and John Doe Supervisors 1-10)

124.    The Plaintiff re-alleges and incorporates by reference paragraphs 20-76 above, with the same force and effect as if fully set out in specific detail herein.

125.    Plaintiff engaged in constitutionally protected activity when she reported being sexually assaulted by Defendant Brantley, filed a PREA complaint, cooperated with investigators, and filed grievances regarding her safety.

126.    After Plaintiff engaged in protected activity, Defendants subjected her to adverse actions, including but not limited to:

(a) disclosing her rape to inmates;

(b) allowing inmates to accuse her of lying;

(c) refusing to separate her from officers who facilitated the assault;

(d) leaving Defendant Whiteside in authority over her;

(e) exposing her to harassment, intimidation, and retaliation; and

(f) failing to provide protective housing or transfer.

127.    These actions would chill a person of ordinary firmness from reporting sexual abuse.

128.    Defendants' retaliatory conduct was substantially motivated by Plaintiff's reporting of the sexual assault and her exercise of her constitutional right to seek protection and redress.

129.    Defendants acted under color of state law to punish Plaintiff for reporting rape and to deter future complaints.

130.    Defendants' retaliation violated Plaintiff's First and Fourteenth Amendment rights.

131.    As a direct and proximate result of Defendants' retaliation, Plaintiff suffered fear, humiliation, psychological trauma, and increased risk of harm.

## PRAYER FOR RELIEF

**WHEREFORE,** premises considered, Plaintiff respectfully prays that this Court will assume jurisdiction of this action and, after trial, provide relief as follows:

1.    Issue an Order requiring Defendants to make Plaintiff whole by awarding nominal damages, compensatory damages and punitive damages.

2.    Awarding punitive damages against each Defendant as allowed by law.

3.    Injunctive relief to ensure Defendants do not continue to violate the United States Constitution by way of the ongoing unlawful policies resulting in the sexual violations of incarcerated women at Tutwiler such as Plaintiff.

4.    An award of litigation costs and expenses, including reasonable attorneys' fees under 42 U.S.C. § 1988 and other applicable statutes.

5.    Such other and further relief as the Court may deem just and proper.

6.    Damages pursuant to the Alabama law.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY**

Respectfully submitted,

*/s/Nicki L. Lawsen*

Sidney M. Jackson
Samuel Fisher
Nicki L. Lawsen
**WIGGINS, CHILDS, PANTAZIS, FISHER &
    GOLDFARB, LLC**
301 Nineteenth Street North
Birmingham, Alabama 35203
Telephone: (205) 314-0500
sjackson@wigginschilds.com
sf@wigginschilds.com
nlawsen@wigginschilds.com